## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____ )

**UNITED STATES OF AMERICA** )
                                                )
        **v.**                                  ) **Criminal No. 18-cr-10444-NMG**
                                                )
**MORRIE TOBIN,**                               )  **REDACTED DOCUMENT**
                                                )  **LEAVE GRANTED ON**
                          **Defendant**         )  **JULY 15, 2020 (Doc. 82)**
_____ )


## SENTENCING MEMORANDUM OF MORRIE TOBIN

## TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION**................................................................................1

II.    **MR. TOBIN'S PLEA AGREEMENT AND GUIDELINE ANALYSIS**......................3

    A.    **The Plea Agreement**................................................................3
    B.    **The Presentence Report** ............................................................4
    C.    **Guideline Analysis** .................................................................5
        1.    **Role in the Offense** ........................................................5
        2.    **The Adjusted Total Offense Level Should Be 26** ..................9

IV.    **18 U.S.C. § 3553(a) FACTORS DEMONSTRATE A VARIANCE IS APPROPRIATE**................................................................................18

    A.    **Mr. Tobin is Remorseful; He Has Fully Accepted Responsibility**..................19
    B.    **Mr. Tobin's History and Personal Characteristics**...........................21
        2.    **Mr. Tobin Has Worked Hard Since a Youngster** .................................23
        3.    **Mr. Tobin's Adult History Reflects His Commitment to Family and Community**..............................................................24

    C.    **A Non-Custodial Sentence Will Provide Sufficient Deterrence to Both Mr. Tobin and Others**..............................................................30
    D.    **The Coronavirus Pandemic Further Justifies a Noncustodial Sentence** ........31

V.    **CONCLUSION** ................................................................................32

## I.   <u>**INTRODUCTION**</u>

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

Mr. Tobin committed a serious crime: he engaged in a securities fraud conspiracy—what is colloquially referenced as a "pump and dump" scheme—hiding his stock ownership and participating in activities to artificially raise share price.  With his objections previously conveyed to the presentence officer and noted herein, that conduct is fairly described in the presentence report.  Mr. Tobin has fully accepted responsibility for his conduct.

Mr. Tobin is 57 years old.  This case is his only contact with law enforcement; he has no criminal record.  ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

───────────────────────────

█ ████████████████████████████████████████████  ███ ██  ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████  ███ █████

███████ ████ ███████ ████ █████ ████ ████ █████ ██████ █████ █

████████████████████████████████████████████████████  ███ ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█ ████████████████████████████████████████████████████

████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

Based on 18 USC § 3553(a), the United States Sentencing Guidelines, ██████████ ████████████████████████ and all other applicable authorities, Mr. Tobin respectfully requests that the Court do the following:

- Find the adjusted offense level here to be level 26 with a corresponding GSR of 63-78 months (rather than the GSR of 97-121 months set forth in the PSR);

- ████████████████████████████████████████████████ ████████████████████ substantially depart downward from the otherwise applicable guideline range;

- ████████████████████████████████ exercise its broad sentencing discretion by further applying a downward *Booker* variance, pursuant to 18 U.S.C. § 3553(a), to account for the many mitigating factors present in Mr. Tobin's case, and provide a sentence that is fair and sufficient, but not greater than necessary, to meet the purposes of sentencing;

- Impose a non-custodial probation sentence, with a requirement that Mr. Tobin continue to perform regular community service, either for the Los Angeles Mission (as he has been) or a similar facility serving the homeless or otherwise needy population;[2] and

- Order forfeiture in the amount as set forth in the plea agreement of $4,000.000.

For the reasons set forth below, such a sentence is appropriate here.

---

[2] To the extent that it is currently impracticable because of the COVID-19 pandemic to provide such community service in-person, Mr. Tobin is committed to resuming his community service when the Los Angeles Mission (or other similar facilities) deems it safe for volunteers to return to service.

## II.   MR. TOBIN'S PLEA AGREEMENT AND GUIDELINE ANALYSIS

### A.   The Plea Agreement

█████████████████████████████████████████████████

███████████████████   ████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████

█████████████████████████████████████████████████

████████████   An Information was filed on November 27, 2018 and Mr. Tobin's plea agreement was filed on December 3, 2018.  Mr. Tobin entered his guilty plea on February 27, 2019.  Mr. Tobin's plea agreement sets forth the terms of his plea; ████████████████ ███████████████████████████.

The plea agreement contains the government's guideline analysis; it sets forth that the U.S. Attorney will take the position that Mr. Tobin's total offense level under the United States Sentencing Guidelines ("U.S.S.G.") (prior to any adjustment for acceptance of responsibility) is calculated as follows:

a)   Defendant's base offense level is seven (U.S.S.G. § 2B1.1(a)(1));

---

█████████████████████████████████████████████

███████████████████████████████

b) Defendant's offense level is increased by 20, because the total loss or intended loss amount for the offenses of conviction and related conduct is more than $9,500,000 but not more than $25,000,000 (U.S.S.G. § 2B1.1(b)(1)(K));

c) Defendant's offense level is increased by two, because a substantial part of Defendant's fraudulent scheme was committed from outside the United States, and the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting the sophisticated means (U.S.S.G. § 2B1.1(b)(10)); and

d) Defendant's offense level is increased by four because Defendant was an organizer and leader of a criminal activity that involved five or more participants and was extensive (U.S.S.G. § 3B1.1(a)).

The United States Attorney's Office's position is that the adjusted offense level, after taking into account a three-level decrease for acceptance of responsibility under § 3E1.1, is a level 30 (with a corresponding GSR of 97-121 as opposed to the GSR of 63-78 requested by Mr. Tobin). Plea Agreement at 2–3. The plea agreement does not bind Mr. Tobin to these calculations and allows Mr. Tobin to argue that this guideline calculation is not appropriate. It permits the parties to argue for a sentence outside the guideline range based on 18 U.S.C. § 3553(a) factors.

██████████████████████████████████████████████████

**B.**     **The Presentence Report**

On May 1, 2020, the United States Probation office ("USPO") disclosed its presentence report ("PSR"). It calculates the adjusted offense level just as the United States Attorney did. Specifically, the PSR calculates a base offense level of seven, increased by twenty because of its calculation of loss amount, increased by two because it found a substantial part of the scheme was committed from outside the United States, and increased four levels because of Mr. Tobin's role in the crime. After acceptance of responsibility, the PSR calculates an offense level of 30. The PSR confirms that Mr. Tobin is in criminal history Category I, with an advisory guideline range of 97–121 months. (The government has not yet served a response to the PSR.) Mr. Tobin has

already sent his objections and corrections to the PSR to the USPO; his objection focuses on the application of a four level role enhancement.  His objections are discussed below.

### C.    Guideline Analysis

Both the USAO and the PSR apply a four level upward adjustment for the role in the offense.[4]  As set forth below, the upward adjustment for the role in the offense is not merited here.

### 1.    Role in the Offense

An adjustment for role in the offense is not merited here.  The four-level adjustment for role applies to those who supervise five or more people in large scale criminal organizations.  It should not apply when each participant has an independent key role and operated in their own spheres.  *See United States v. Frankenhause*r, 80 F.3d 641, 654-55 (1st Cir. 1996) (reversing and vacating sentence when there was no finding the defendant organized or supervised others involved in the scheme); *United States v. Avila*, 95 F.3d 887, 890–92 (9th Cir. 1996) (holding it was clear error to apply a role enhancement when the defendant organized the transaction but did not exercise control over others).  Mr. Tobin worked together with several other individuals to conduct the criminal activities here.  But he was not an organizer-leader as that term is usually used.  As shown below, here, at times, Mr. Tobin directed the actions of some participants.  At other times, however, other individuals directed each other's actions (including Mr. Tobin's own actions).  And each participant had substantial independence and authority within their own ambit of responsibility.

Section 3B1.1(a) provides for elevating the offense level of "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."   U.S.S.G. § 3B1.1(a).  The Guidelines do not define "organizer, leader, manager or supervisor," but the comments make clear that the rules apply to organizations with a ***structural hierarchy***.  *See* U.S.S.G. § 3B1.1, background cmt. ("This section provides a range of adjustments to increase the

---

[4] The PSR and USAO suggest an adjustment because a substantial part of the scheme was conducted outside the United States, as well as twenty-level level increase for loss.  Mr. Tobin does not contest either upward adjustment.

offense level based upon ***the size of a criminal organization*** . . . The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.") (emphasis added); *id.* n. 4 (enumerating factors such as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others"); *see also United States v. Tejada-Beltran*, 50 F.3d 105, 110–13 (1st Cir. 1995) ("***Because the Sentencing Commission envisions large-scale criminal activities as hierarchical, the guidelines punish the persons atop the pyramid more severely based on their relative responsibility***.") (emphasis added).

The PSR writes that Mr. Tobin "exercised use and control of the various nominees, and he directed the actions of Patel, Ledvina, Lacher, and the CEO in carrying out the steps necessary to implement the schemes." PSR ¶ 83.  To be clear, while at times Mr. Tobin directed the actions of others involved in this scheme, at other times, those involved in the scheme, including Mr. Patel, Mr. Ledvina, Mr. Lacher, Mr. Quinn, and others, directed the actions of each other as well as Mr. Knox's actions.  And each individual was responsible for their own area of expertise.  This sharing of responsibility is described in the amended complaint filed by the SEC in the securities violation matter.  *See SEC v. Tobin*, 1:18-12451-NMG.  For example:

- According to the SEC complaint addressing the very conduct at issue in this criminal case, Brian Quinn was Mr. Tobin's "***partner in the scheme***."  *Id.*, Dkt. No. 22, ¶ 5 (emphasis added).[5]  The SEC complaint does not describe Mr. Tobin as Mr. Quinn's supervisor, manager, or organizer, but instead, describes Mr. Quinn and Mr. Tobin as partners.  Such a characterization is appropriate, given both that Mr. Quinn ran an independent business and because of Mr. Quinn's own role directing the actions taken by the conspiracy.  Mr. Quinn operated his own independent business, "an investor

relations company," which "provide[d] a wide variety of services for public companies that need results-oriented investor relations programs," and "assist[ed] private companies with pre IPO services." *Id*. ¶ 20. Mr. Quinn introduced Mr. Tobin to Mr. Skriloff. *Id*. ¶ 36. As part of his partnership role in the scheme, Mr. Quinn: "(a) facilitate[d] a reverse merger between the public company controlled by Tobin (then a "shell company" with no operations) and a private bulk-packaging company, the combination of which became Environmental Packaging; (b) arrange[d] and overs[aw] a $1 million promotional campaign designed to inflate the share price and trading volume of Environmental Packaging stock after the reverse merger; and (c) direct[ed] the offshore asset managers' selling of the Environmental Packaging stock in order to profit from the artificially inflated demand for Environmental Packaging stock." *Id*. ¶¶ 5, 73 ("Quinn directed the trading . . ."). Those actions all resulted from Mr. Quinn's business efforts and relationships. Further, such a characterization is appropriate because Mr. Quinn received half of the profits from the scheme. *Id*. ¶ 38.

- David Skriloff was the CEO of "a private bulk-packaging company and then the CEO of Environmental Packaging after the reverse merger. *Id*. ¶ 21. Mr. Skriloff "negotiated the reverse merger" with Mr. Quinn and Mr. Tobin (which he presumably would not have any ability to do if taking direction from Mr. Tobin). *Id*. ¶¶ 6, 21. The SEC complaint acknowledged that these negotiations lasted for much of 2016. *Id*. ¶ 39, 43–46. Indeed, in the SEC's complaint, Mr. Skriloff is charged with violations separate from Mr. Tobin. *See generally id*. Further, Mr. Skriloff instructed other members of the conspiracy. *Id*. ¶¶ 61, 70, 71, 85, 86. Mr. Skriloff gave Mr. Tobin specific instructions for the reverse merger, and Mr. Tobin also provided instructions to Mr. Skriloff. *See id*. Likewise, Mr. Skriloff gave Mr. Quinn specific instructions, and Mr. Quinn provided instructions to Mr. Skriloff. *See id*.

- Daniel Lacher "operated a financial services company with a principal place of business in Volketswil, Switzerland. Mr. Lacher provided services to undisclosed

company insiders or control persons as an intermediary to foreign asset managers and brokers." *Id*. ¶ 19.  Mr. Lacher provided these services not only to Mr. Tobin but to others seeking access to foreign managers and brokers.  According to the SEC complaint, Mr. Patel and Mr. Quinn primarily directed Mr. Lacher's efforts.  For example, Mr. Quinn instructed Mr. Lacher (through Mr. Tobin) to direct the sale of the stock from the offshore asset managers.  *Id*. ¶ 75.  At that point, Mr. Lacher was responsible for the sale.  For his role, Mr. Lacher was compensated—compensation which he independently negotiated to receive from "the group's" efforts.  *See id*. ¶ 34 ("Lacher charged Tobin a fee of 1.5% of the group's trading proceeds for his involvement in the scheme")

- Matthew Ledvina and Milan Patel were business associates *before* they met Mr. Tobin. Milan Patel was a Florida-based attorney who worked in the tax group of a law firm based in Switzerland.  *Id*. ¶ 17.  Matthew Ledvina was "an attorney and colleague of Patel's at an international law firm headquartered in Zurich, Switzerland." *Id*.¶ 18.  Mr. Patel understood their responsibilities and coordinated his and Mr. Ledvina's efforts. Messrs. Ledvina and Patel worked jointly and were paid jointly.  *Id*. ¶¶ 34 ("Patel and Ledvina agreed with Tobin that they would be paid 4.5% of the group's net trading proceeds, after paying fees associated with offshore asset managers and other costs."); 32 (Messrs. Patel and Ledvina created MT Global Holdings); 80 (Messrs. Patel and Ledvina met with Knox); 94 (Messrs. Patel and Ledvina created Aureus Financial Holdings); 94 (Messrs. Patel and Ledvina invested in the scheme jointly); 100 (Mr. Tobin negotiated with Messrs. Patel and Ledvina).  Together, the two handled the legal aspects of the scheme—including creating entities, drafting paperwork, preparing trading instructions, and engaging Mr. Knox to "cleanup" the fraud.  *See generally id*.

- Roger Knox, who was not charged with the above defendants but was charged in his own criminal case, was already independently engaged in such schemes.  Case No. 1:18-cr-10385-NMG, Dkt. No. 1 ¶ 8 ("From approximately June 2015 to the present .

. .").  Mr. Knox's criminal conspiracy entailed the sale of over 100 stocks for a total of approximately $164 million in proceeds.  *Id.* ¶ 9.  In short, his involvement in any matter involving Mr. Tobin was limited to assisting Messrs. Patel, Ledvina, and Lacher with the sale of two stocks—not in the other 100 separate stocks he sold as part of his much larger and ongoing criminal scheme.  Further, the SEC complaint and the indictment charging Mr. Knox do not include any allegations that Mr. Tobin had any substantial contact with Mr. Knox or those who generally worked with Mr. Knox— indeed, Mr. Tobin had very minimal contact with Mr. Knox.

These individuals and their actions did not comprise a "hierarchical" criminal organization, but constituted instead a series of business partnerships or individually negotiated business relationships—many of which existed without Mr. Tobin's coordination or involvement.  For example, Mr. Patel and Mr. Ledvina were already business partners, and Mr. Quinn already knew Mr. Skriloff.

For the four-level role enhancement to apply, Mr. Tobin must have been "an organizer or leader of a criminal activity that involved ***five or more participants*** or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a).  Because Mr. Tobin did not direct at least four of the above participants, the enhancement should also not apply here.  It is clear that Mr. Tobin did not "organize or lead" Mr. Quinn (his partner), Mr. Skriloff (who exchanged instructions with both Mr. Tobin and Mr. Quinn), Mr. Lacher (who primarily took direction from Mr. Patel as well as Mr. Quinn—as conveyed through Mr. Tobin), Mr. Ledvina and Mr. Patel (who took independent actions jointly), or Mr. Knox (whom it is not even alleged that Mr. Tobin directed).  Nor is any direction to other participants described.  Accordingly, the four-level organizer/leader enhancement is not appropriate here.

### 2.    The Adjusted Total Offense Level Should Be 26

Mr. Tobin's total offense level under should be calculated as follows:

a)  Defendant's base offense level is seven (U.S.S.G. § 2B1.1(a)(1));

b) Defendant's offense level is increased by twenty, because the total loss or intended loss amount for the offenses of conviction and related conduct is more than $9,500,000 but not more than $25,000,000 (U.S.S.G. § 2B1.1(b)(1)(J)-(K));

c) Defendant's offense level is increased by two, because a substantial part of Defendant's fraudulent scheme was committed from outside the United States, and the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting the sophisticated means (U.S.S.G. § 2B1.1(b)(10)); and,

d) Defendant's offense level is decreased by three because he has accepted responsibility (U.S.S.G. § 3E1.1).

Accordingly, the adjusted offense level is 26 and the GSR should be 63-78 months.





- ██████████████████████████████████████████
  ██████████████████████████████████████
  ████████████████████

████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████

- █████████████████████████████████████

████████████████████████████████████████
████████████████████████

████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████

███████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████



## IV.    18 U.S.C. § 3553(a) FACTORS DEMONSTRATE A VARIANCE IS APPROPRIATE

In determining Mr. Tobin's sentence, the Court must consider a broad range of statutory sentencing considerations, along with the advisory Guidelines. *United States v. Booker*, 543 U.S. 220, 245-46 (2005); 18 U.S.C. § 3553(a). The Court should impose a sentence sufficient, but not greater than necessary, to achieve the objectives of sentencing. *See Kimbrough v. United States*, 552 U.S. 85, 91 (2007) (holding crack/cocaine disparity in Guidelines yield a sentence that is "greater than necessary") (citing 18 U.S.C. § 3553(a)).

The advisory Guidelines are the "starting point and the initial benchmark" of the sentencing process. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Court also considers the "3553" factors. 18 § U.S.C. 3553 (a)(1-7). While the Court is required to take account of the advisory Guidelines, together with other sentencing factors, it may not presume that the advisory Guidelines range is reasonable. *See United States v. Mendez*, 802 F.3d 93, 97 (1st Cir. 2015) (remanding for resentencing because record did not support sentence); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009) (*per curiam*) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original).

Instead, the Court must calculate the advisory Guidelines range and then consider what sentence is appropriate for Mr. Tobin in light of the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). The Court's sentencing determination must be individualized, based on the

particular facts presented in Mr. Tobin's case.  *See Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."); *see also United States v. Mehta*, 307 F. Supp. 2d 270, 275 (D. Mass. 2004) ("This much is clear: It is not at all uncommon in sentencing to put the crime in the context of the defendant's life.  For example, courts enhance a sentence because the defendant's background reflects a life of crime and nothing else . . . .  With respect to extraordinary good works, the lens is the opposite—looking at the offense in the context of a lifetime of service.").

Pursuant to 18 U.S.C. § 3553(a) and after consideration of the advisory Guidelines range, the defense respectfully requests that the Court depart downward to a level appropriate to impose a non-custodial sentence of probation, with conditions, including that Mr. Tobin continue to perform regular community service, either for the Los Angeles Mission (as he was until the COVID-19 pandemic) or a similar facility serving the homeless or otherwise needy population, and order forfeiture in the amount as set forth in the plea agreement of $4,000.000.

The PSR overviews Mr. Tobin's history and personal characteristics.  *See* PSR ¶¶ 98-146.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

**A.**     **Mr. Tobin is Remorseful; He Has Fully Accepted Responsibility**

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



Since February 2018, Mr. Tobin has done what he can to accept responsibility and move forward.

**B.**     **Mr. Tobin's History and Personal Characteristics**

### 2.     Mr. Tobin Has Worked Hard Since a Youngster

Since a young age, Mr. Tobin has demonstrated a strong work ethic, especially in athletics. He first excelled in hockey and academics in Montreal, graduating high school (11th grade in Canada) and then spending a postgraduate year (12th Grade) at the Northwood School, a preparatory school focused on athletics in Lake Placid. ██████████████████

At Northwood, Mr. Tobin was an honors student, a highly respected student leader, and the captain of the school's ice hockey team. *Id.* ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████ Thanks to his discipline and hard work in his physical therapy, he recovered enough to enable him to return to the hockey rink. Based on his accomplishments, he was admitted to Yale, where he continued to play hockey.

████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████

████████████████████████████ Mr. Tobin finished his college education and his collegiate hockey career at the University of Vermont, and he graduated from University of Vermont with Bachelor's degrees in economics and political science.  After college he briefly played semi-pro ice hockey in Europe, before returning to North America.

3.      **Mr. Tobin's Adult History Reflects His Commitment to Family and Community**

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



Mr. Tobin's support letters underscore Mr. Tobin's positive character traits.  Mr. Tobin respectfully requests this Court take this into consideration when fashioning an appropriate sentence.

**C.**      **A Non-Custodial Sentence Will Provide Sufficient Deterrence to Both Mr. Tobin and Others**

**D.**     **The Coronavirus Pandemic Further Justifies a Noncustodial Sentence**

Finally, though not a factor explicitly mentioned in Section 3553(a), the coronavirus pandemic should be considered in imposing a sentence ████████████████████████████. Indeed, authorities in the United States have begun to embrace alternatives to incarceration to help stem the spread of the virus among inmates and prison personnel.  On March 26, 2020, Attorney General William Barr issued a memorandum to the Director of the Bureau of Prisons ("BOP") to express that "at-risk inmates who are non-violent and pose minimal likelihood of recidivism" would be "safer serving their sentences in home confinement rather than in BOP facilities." Memorandum for Director of Bureau Prisons, Office of the Attorney General (Mar. 26, 2020), *available at* https://www.justice.gov/file/1262731/download; *see also* Sarah Lynch, "U.S. Attorney General Seeks to Expand Home Confinement Option as Coronavirus Spreads in Prisons," REUTERS (Mar. 26, 2020), *available at* https://reut.rs/2xzF7pQ.  The Attorney General advised that the BOP should "utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody," and he provided criteria for the BOP to use in making release determinations.  *Id.*  Those criteria included: "[t]he age and vulnerability of the inmate to COVID-19"; "[t]he security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities"; "[t]he inmate's score under [the BOP's risk assessment tool used to predict recidivism]";[10] "[w]hether the inmate has a demonstrated and verifiable re-entry plan," including whether he would face a lower risk of contracting COVID-19 upon release than he would face in his BOP facility; and "[t]he inmate's crime of conviction, and assessment of the danger posed by the inmate to the community."  *Id.*

The health risk to Mr. Tobin, who is in his late 50s, is significant.  While the Coronavirus spreads through the country's prisons, any term of incarceration would be inconsistent with Section 3553, ███████████████████████████████████████████████

---

[10] Under the BOP's risk assessment tool, Mr. Tobin falls into the "minimum" risk category and likely would be eligible for early release. See "Prisoner Assessment Toll Targeting Estimated Risk and Needs (PATTERN) Interactive Tool," Urban.org (Sept. 4, 2019), *available at* https://apps.urban.org/features/risk-assessment/.

## V.     CONCLUSION

Based on the foregoing, the defense respectfully requests that the Court impose a non-custodial sentence of probation, with a requirement that Mr. Tobin continue to perform regular community service, either for the Los Angeles Mission (as he has been) or a similar facility serving the homeless or otherwise needy population, and order forfeiture in the amount as set forth in the plea agreement of $4,000.000.

Respectfully Submitted,

*/s/ Brian T. Kelly*
Brian T. Kelly (BBO No. 549566)
Charles Dell'Anno (BBO No. (691894)
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
bkelly@nixonpeabody.com
cdellanno@nixonpeabody.com

Dated: July 22, 2020

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date, July 22, 2020.

*/s/ Charles Dell'Anno*

**[ATTACHMENTS REDACTED]**